Negrete v. Citibank. Good morning, Your Honors. Blaine Bortnick of Rasco Clock, Perez, and Nieto represent the plaintiffs Eduardo and Gervasio Negrete. The conduct here by Citibank is not in dispute. The Negretes and Citibank entered into thousands of separate contracts over the telephone, each contract for either the purchase or the sale of foreign exchange. Now, for ease of use, I'm just going to refer as to purchases and not talk about sales, but it works both ways. Each contract for the purchase of foreign exchange was at a very particular price. It was the price that was agreed to, the actual number, over the telephone, or because it's a limit order, which is not a disputed term here, the best, any better price available in the market at the time of execution. I'm having trouble understanding what these transactions are really supposed to be according to the ISDA agreement. The way you describe these transactions, and maybe this just means it's a disputed issue of fact, I don't know. The way you describe the transactions, it sounds like someone's talking to his or her broker, right? You call up Merrill Lynch and you say, buy me 100 shares of Google at the market, or buy it if it goes below or above a certain price, or sell it if it goes below a certain price. And that's their job, is to execute the order. But the underlying agreement between the parties stresses that the counterparties are acting as principles, that this is buying from Citibank, or selling to Citibank. And it's a little hard for me to understand how a transaction like that operates as, I mean, if there's a contract that says, we'll buy at the market price, and it's agreed, there's an objective determinant of what the price is, then they're supposed to sell at that price, right? There's sort of a two-part response. And actually, your question is sort of, in thinking about that, reminded me almost in an analogous context in antitrust, where you have like a two-sided market. Because in effect, Citibank is two-sided here. On one hand, the Negrettes, they have statements that Citibank gives them every month, and, you know, that's your brokerage statement that has all of these transactions listed. So in that sense, yes. But the way the ISDA agreements operate here is that it's a master agreement. And there are, as we point out in the brief, an important difference with respect to damages between the two plaintiffs here. But it's a master agreement sort of setting out the general framework, how things are going to happen.  Exactly. But what is your contention, what is it, what are you contending that the contract is? When Mr. Negrette calls up and says, I want X euros, I want to buy X euros, right, at the market price. It doesn't say the market price. That's the difference. I thought there was a market, I thought there were market transactions. No, they're limit. Virtually all, although I don't think it makes much of a difference if you're using market. Then I'm still puzzled at what a limit order would be if I go into a merchant who is acting as an independent principal, and I say I'd like to buy this, but only if you can get it at a certain price. The issue is I want to pay this price, and the other side says either yes or no. Well, but that's because the definition, and it's not a disputed definition here of a limit order, is you get it for me at either, you know, the price that we specify, or if you can get it at a better price when you execute, that's the price. That's suggesting, though, that the other party is operating as your agent, isn't it? Well, but that's, well, in effect, they have to go and buy it. The contract is you have to go and do something as my counterparty. You have to go buy it at this price and sell it to me. So in that sense — But you have to go and buy it at a certain price and sell it to me at the same price. Yes, and the difference here is, for example, and it's in the brief, UBS, you know, pled guilty to this exact same conduct. What was missing in this contract is that we're going to charge a commission or a spread. Citibank, which is also a sophisticated party here, did not build that into the contract. They could have because we're talking about limit orders here. That is the terms of each and every individual contract. Was there an obligation on Citibank's part to provide the best available price? Yes, because it's a limit order, yes. That's the definition of a limit order. So I thought, and I may be mistaken, I thought the idea of a limit order is that when the price reaches X, we want you to do the transaction. No. But you're saying that Citibank, that the contract includes an obligation on Citibank's part to find the best available price. Well, it's — no, what it is is you execute at that price, or if at the time of execution there's a better price, you take that price. You don't wait until the price keeps going, you know, up and up and up so that Citibank can execute at a different price and take the difference. They could have built that into each and every contract. They never did. That's the whole point of a limit order in this context. And as I said, it's never been disputed here at all from day one what a limit order is.  So, you know, and this really gets the essential — there are sort of two things that this decision fundamentally turned on in the larger issues here. One is, isn't Citibank entitled to take a profit? Well, first of all, they're making plenty of profit on the negretes, and, you know, they're making hundreds of thousands of dollars because the negretes are doing almost all the transactions on margin. And it's not in substantial margin. The notional values are high. They're making hundreds of thousands of dollars of profit, again, undisputed. But just because they're making profit doesn't mean they can't make more profit. That's correct. But they need to. But when you have a contract, the contract does not allow for them to build in a commission or build in a spread or wait. That is an express violation of the terms of the contract. The allegation of the complaint is that, as you're presenting it to us, is that one or both of the negretes, when they made these oral agreements with Citibank, made clear enough, or at least that's the allegation, and that can be tested in discovery and cross-examination and trial, made clear enough that they understood the term to be that Citibank was supposed to go into the market and execute a transaction on their behalf and come back with a particular kind of price, and they said yes. And that's not only that, but it's not even disputed. And then further, what we know is that Citibank, once the contract is in place, they went through all these shenanigans between their traders and deliberately lied to the negretes about what happened. So Citibank also, not only from the conduct that they've admitted to, but it's never been an issue here in this case. The other issue that the district court incorrectly— Well, when you—I mean, when you say it's not disputed, it's dismissed at the pleading stage. Well, but we also cross-moved for summary judgment on this, and the facts that I'm talking about were never disputed. There actually was a cross-motion for summary judgment with respect to liability on the contract claim, and that's also part of this appeal. Damages are a separate issue, because it's not disputed that each and every individual trade contract was not executed at the contract price, a different price. The question is, was there an oral conversation in which the terms of the transaction were sufficiently specific to overcome whatever is in the ISDA agreement that suggests that these are parties operating at arm's length and that the deal is they're not being a broker who's supposed to go out and execute orders. They're a counterparty who's buying and selling. And if—you know, I'm not saying that that can't be overcome. I'm just saying the question is, are the telephone conversations—are they agreeing? They don't dispute that the telephone conversations make an agreement that says you will go and get for us something at a certain dollar price. There's nothing in this record whatsoever that says otherwise. So the answer is yes. But the ISDA agreements, remember, it doesn't matter if you're principal or agent here. The agreement between the parties is a limit order, and that is the definition of a limit order. Thank you, Mr. Bordnick. You've reserved two minutes for rebuttal. May it please the Court, Your Honors. Marshall Fishman from Goodwin-Proctor for Citibank N.A. There are four fundamental points that compel affirmance of the district court's decision dismissing the amended complaint here. First, pursuant to the ISDAs, the parties transacted approximately $15 billion notional per year in thousands of FX trades over a 10-year period, including during the financial crisis. Yet there were no trading losses alleged. The ISDAs disclose the complex risks of loss and volatility in FX trading, yet there's not a single allegation of a losing trade or of an out-of-pocket loss. Thus, there is nothing that Citi did or did not do. What about the breach of contract? Yes. Why does there need to be a loss if there was a contract that says an agreement, oral agreement on the telephone, that is alleged in this complaint? This is just an allegation as far as I'm concerned at this point. The allegation is we had an agreement on the telephone that in effect said you will act like a broker. You will go out and execute this kind of transaction for us in this way. And if that didn't happen, and then instead Citi Bank comes back with some other kind of thing and represents that they did do what they were obligated to do, but they hadn't, and therefore they got a worse price than what the contract should have been, that's sufficient for a breach of contract claim, isn't it? No, it's not, Your Honor. Here, the appellants failed to cite to any provision of the ISDAs that they supposedly breached. In addition — But they don't have to — but that's not their argument. Their argument isn't you breached the ISDA. The ISDA itself says this is a generalized framework, and now there are going to be transactions of a totally unspecified kind, as far as I can see from reading it. It could be any kind of transaction. And they're saying the course of dealing and the specific oral communications were, as I read it, we treated you like a broker, and you agreed to be treated that way, and you took limit orders. You took at-the-market orders. You didn't — we didn't sort of agree on a price that you're going to sell us at. Now, that may be wrong. That may be disputable. But I'm trying to understand why the ISDA agreement doesn't allow for those kinds of oral contracts to be made. First off, Your Honor, the ISDA agreement does contemplate that orders would be taken by the phone, subject to the framework of the ISDA. You can't take an ISDA agreement where the parties are principals trading for their own account, relying upon their own analysis, and turn that into a broker-dealer best execution situation. That's number one. Number two, the ISDA specifically referred to that, in addition to the ISDAs, the confirmations in the ISDAs will form the agreement. Here, there's no allegation whatsoever in the amended complaint that any provision of any confirmation was breached. In addition, the specific allegations of the complaint, taking them as true as the Court must, at the appendix, page 548, all they say, all they allege, in paragraph 35 of the amended complaint, and it goes on for 20 allegations about the individual trades, is that they placed an order by phone with an unknown Citibank employee, and if it reached 75.95 or better, then Citi would fill it. That's their allegation. There's no allegation of a contract, of a conversation, whether it was a misrepresentation or a representation. They're trying to turn this into a broker-dealer situation, which, subject to the framework of the ISDAs and of the confirmation, it is not. In addition, in each of these allegations with respect to the specific trades, they filled the order, as Judge Sweet found below, they filled the order at the exact price requested. So paragraph 35, they requested it 75.95. That's where they filled it. Paragraph 36, they requested it 87.37. They filled it at 83.37. How do you read the statement that the order was if it reached 75.95 or better? If it reaches better, then you can still buy it at 75.95? If it reaches 75.95 first, you're going to fill it there. That's a limit order. But what if you don't? The argument, the allegation is that you didn't fill it immediately when it reached 75.95. You filled it at a later date and then sold it to them at 75.95. That's not exactly the allegation, Your Honor, with all due respect. In paragraph 35, they just say it reached 75.95 or better. Later that day, they filled it at 75.95, but the best available price was 0.56, and they're saying that Citi took a markup from that. Well, what is the best? You know, they're alleging, I guess, I mean, the wrongful markup is the idea that Citi bought it at 75.56. That's the implication of that anyway, isn't it? It's not clear, but that's an implication. But in any event, it is implausible on the face of this amended complaint to suggest that Citi engaged in thousands upon thousands of FX trades as a principal under the ISDA for over eight years and did so free of charge. That is just completely contrary to the clear terms of what this relationship was. Nowhere in their briefs do they address the counterparty principal-to-principal trading relationship. Nowhere. They don't dispute it, and the law is clear in the cases that we've cited, the money transfer case, that a counterparty is entitled to profit for its own account and is entitled to markup a transaction. The district court correctly held Citi had no fiduciary obligation to provide plaintiffs with best execution. Citibanks and the Negretti's were both principals. In addition, the ISDA's state that appellants act for their own account. They're trying to completely turn this contract into something that it was not. It's implausible on its face. But in addition, what the plaintiffs here did, what the appellants did, they dismissed out voluntarily because Judge Sweet only granted the motion to dismiss the contract claim in part. He let them proceed with any transactions that were failed to execute or executed only in part by virtue of their allegedly taking a markup. And when we served discovery requests on those claims, they defaulted, and then they even voluntarily discontinued with prejudice every contract claim based on anything that potentially caused an element of damages. They just dismissed it outright. They're not part of this court on appeal. That was in part tactically in order to be able to appeal the judgment to date, if you will, correct? I think so, Your Honor, whatever their tactics were. But in any event, it was only after we served. Let's say when that happened, then it was a final order subject to entry of judgment that could be appealed. Yes, but first we served discovery requests seeking the actual trades that they were claiming formed the breach of contract. They failed to comply with those discovery requests, and it was only after that that they voluntarily discontinued with prejudice. As to their fraud claim, again, each of these allegations, like in paragraph 35, 36, at appendix 548, there's an unknown city employee. There's no misrepresentation whatsoever that is identified in any of these paragraphs of the amended complaint. They failed to allege how any misstatement affected any of their investment decisions. We cite to the Mills v. Polar case in page 27 of our brief for that proposition. And they again say it's breach of contract, not fraud. So in addition, there's no allegation of reliance. There's no allegation of causation. And there's no allegation of any out-of-pocket loss on a single transaction. All they claim is at pages 1 to 4 of their brief that, quote, unquote, city was prohibited from profiting. Could you imagine that as a matter of practicality, that a bank is conducting thousands upon thousands of transactions as a principal under an ISDA for almost a decade during the financial crisis, and they're saying the allegation is that, no, you are not entitled to profit. You were prohibited from profiting. That is contrary to the terms of the ISDAs. Judge Sweet, we maintain, got it right. And absent any of the questions, we respectfully request that decision be affirmed in its entirety. Thank you, Your Honors. Thank you, Mr. Fishman. Mr. Borden. Citibank was not prohibited from profiting. It's just how much. They were already profiting hundreds of thousands of dollars based on the relationship. But I do want to draw your attention to page 685 of the record. At the bottom, 1A, where it talks about each of the individual transactions, because I don't think the ISDA is being interpreted correctly by my adversary. It says that the parties agree that with respect to each transaction, a legally binding agreement shall exist from the moment that the parties here to agree on the essential terms of such transaction. And that's exactly what Your Honor was getting at in your conversation with me. Exactly. But the best I could get, not out of the complaint even, but out of the summary judgment motion, there's a statement there by Gervasio Negrete that says that they gave very definite instructions. There were limit orders. Here's what a limit order is. Then there's a statement that says, if the better price is available to Citibank at the time it executes a limit order, then Citibank is required to give that better price to the client. Now, there's no statement in there. There's nothing that says that's what we agreed to on the telephone. You're saying this is — Well, that's because they're limit orders. He's really getting into what is the definition of a limit order. And that is what is — that's been the allegation. But it doesn't say that in the ISDA, right? No, the ISDA doesn't say one way or the other. It just says we're going to agree to separate contracts under whatever terms. How was that obligation entered into? Was it entered into each time there was a telephone conversation? Yes, and that's exactly what the ISDA said, that they would be contemplated. It didn't exclusively limit it, but the ISDA said contemplated specifically. So each — Calling the trading desk or the order guy. I mean, this is a very thin kind of allegation for people who are engaging in these thousands of transactions over a many-year period. It's not even an allegation that we did this — we gave these very specific instructions each time for a while, and then it was established that this had become a kind of brokerage agreement as a matter of course of dealing or anything like that. It's just we placed limit orders. I mean, it seems to me that to change the deal from everybody's operating on their own account to you are not operating on your own account, you are to take instructions from us and execute trades a particular way without making any profit on those trades and without acting as a principal on your own account. There would have to be a pretty explicit conversation to that effect. Not in the context of every — they're both sophisticated parties. They both understand what limit orders are. This is the way they trade, and the Negretti's assumed that this is how it was happening. In fact, if this conduct was in fact okay and permissible, then why is this conduct referenced as other relevant conduct in the plea agreement? Why in the same investigation is UBS actually pleading guilty to this exact same specific comment — conduct? What is your response on your adversary's argument that you had to show out-of-pocket losses? Well, with respect to Hervacio's Negretti's is that he doesn't have limitation on damages, so that's part one. But generally and where the larger damages exist here, if the Negretti's purchase at 10 and Citibank executes at 11 — I'm sorry, and executes at 9, then they should have purchased at 9, so they're not getting the contractually agreed price. Now, if that — They're out-of-pocket an extra dollar. Exactly. Now, if it is sold later at 15, then the difference between 10 and 15 would be the lost profit. Not allowed. Under the ISDA agreement, we agree with respect to certain transactions, but with respect to the ISDA that under Hervacio Negretti's separate account — he had a separate account in his name under a different ISDA. Those actually aren't prohibited. But that's the out-of-pocket loss, the difference between the purchase price and the contract price on each transaction. Thank you. Thank you both. Thank you, Your Honor. Well-reserved decision.